RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0137p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

MACKINAC CENTER FOR PUBLIC POLICY,

　　　　　　　　　　　*Plaintiff-Appellant*,

　　　*v.*

UNITED STATES DEPARTMENT OF EDUCATION; LINDA
MCMAHON, Secretary of U.S. Department of
Education; JAMES BERGERON, Chief Operating Officer
of Federal Student Aid, U.S. Department of Education

　　　　　　　　　　　*Defendants-Appellees*.

No. 24-1784

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:23-cv-10795—Thomas L. Ludington, District Judge.

Argued:  February 5, 2026

Decided and Filed:  May 8, 2026

Before: BOGGS, NALBANDIAN, and MATHIS, Circuit Judges.

─────────────────

#### COUNSEL

**ARGUED:**  Russell G. Ryan, NEW CIVIL LIBERTIES ALLIANCE, Arlington, Virginia, for
Appellant.  Sarah N. Smith, UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Appellees.  **ON BRIEF:**  Russell G. Ryan, Daniel Kelly, NEW CIVIL LIBERTIES
ALLIANCE, Arlington, Virginia, for Appellant.  Sarah N. Smith, Michael S. Raab, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

　　　MATHIS, J., delivered the opinion of the court in which NALBANDIAN, J., concurred.
BOGGS, J., concurred in the judgment only.

_____

## OPINION

_____

MATHIS, Circuit Judge.  The COVID-19 pandemic transformed nearly every aspect of daily life.  State and local governments issued stay-at-home orders.  Businesses closed their doors.  Social distancing became the norm.  And the medical system was pushed to its limits.  The executive and legislative branches reacted swiftly to mitigate the effects of the pandemic on the American people.  Some of these actions impacted the federal student-loan system.

From 2020 to 2023, the U.S. Department of Education repeatedly suspended student-loan payments and froze interest for all borrowers.  For those enrolled in student-loan-forgiveness programs, the Department of Education counted nonpayments during the suspensions toward the monthly payments required for total loan forgiveness.  And in June 2023, the Department of Education instituted a twelve-month on-ramp to repayment running from October 1, 2023, to September 30, 2024.  During this period, borrowers needed to make their loan payments and interest accrued on their loans, but the interest did not capitalize at the end of the twelve-month period.

Mackinac Center for Public Policy believes that the Department of Education acted beyond its authority in taking such actions.  So it sued to have these administrative actions set aside, seeking to prevent the Department of Education from counting nonpayments during the repayment-and-interest pause toward student-loan forgiveness.

Because Mackinac failed to establish Article III standing, the district court dismissed its complaint for lack of subject-matter jurisdiction.  We affirm.

No. 24-1784          *Mackinac Center for Public Policy v. U.S. Dep't of Educ.*          Page 3

## I.

### A.

As the costs associated with higher education continue to increase, the number of students needing financial assistance has risen as well.[1]  Many turn to federal loan programs for help.  Through Title IV of the Higher Education Act, Congress aimed to "mak[e] available the benefits of postsecondary education to eligible students."  20 U.S.C. § 1070(a).  It tasked the Department of Education with administering these loan programs.  *Id.* § 1070(b).

One of these programs is the William D. Ford Federal Direct Loan Program.  Through this program, Congress empowered the Department of Education to issue loans directly to student borrowers to assist with the costs of higher education.  *See id.* §§ 1087a–1087j.  As of February 2025, nearly 43 million Americans—one in six American adults—had federal student-loan debt.[2]  And the federal portfolio of outstanding Title IV loans currently exceeds $1.6 trillion, with an average debt balance per borrower of roughly $39,000.[3]  Borrowers can pay back their student loans through various repayment plans.  *See id.* § 1078(b)(9)(A)(i)–(v).  To help offset the financial burden on borrowers, Congress has approved several student-loan-forgiveness programs from time to time.  These programs include the income-driven repayment ("IDR") plans and the Public Service Loan Forgiveness ("PSLF") program.  *See id.* §§ 1087e(m), 1098e(b)(7).

Under the IDR plans, the Department of Education will forgive borrowers' student-loan debt after they make the number of monthly payments required by one of four plans.  34 C.F.R. § 685.209(a).  The IDR plans have a debt forgiveness timeline of 20 to 25 years and allow up to 3 years of deferment for economic hardship to count toward the monthly payment requirement.  *Id.* § 685.209(k).  These plans are based on a borrower's income and family size, and some low-

---

[1]*Digest of Education Statistics: 2025*, Nat'l Ctr. for Educ. Stats. tbl. 331.20 (Oct. 2024), https://nces.ed.gov/programs/digest/d25/tables/dt25_331.20.asp.

[2]Rita R. Zota, Cong. Rsch. Serv., IF10158, A Snapshot of Federal Student Loan Debt 1 (2025).

[3]*Id.*; *see also Trends in College Pricing and Student Aid 2025*, CollegeBoard (Nov. 2025), https://research.collegeboard.org/media/pdf/Trends-in-College-Pricing-and-Student-Aid-2025-final_2.pdf.

income borrowers may have a required monthly payment as low as $0.   *See id.*
§ 685.209(k)(4)(i).

In 2007, Congress created the PSLF program.  *See* College Cost Reduction and Access
Act of 2007, Pub. L. No. 110-84, 121 Stat. 784, 800–01 (codified as amended at 20 U.S.C.
§ 1087e(m)).  The goal is "to encourage individuals to enter and continue in full-time public
service employment by forgiving the remaining balance of their Direct loans after they satisfy
the public service and loan payment requirements of this section."  34 C.F.R. § 685.219(a).  The
Department of Education will forgive the loans of eligible borrowers who: (1) have made 120
monthly payments on their student loans under a repayment plan; (2) are employed in a public
service job at the time of forgiveness; and (3) were employed in a public service job when they
made the 120 payments.  20 U.S.C. § 1087e(m)(1); 34 C.F.R. § 685.219(c).  A public service job
includes, among other professions, working for a tax-exempt nonprofit organization.  20 U.S.C.
§ 1087e(m)(3)(B)(i).

Under the IDR plans and PSLF program, late or partial payments and periods of
forbearance do not count toward a borrower's loan forgiveness timeline.  *See id.*
§ 1087e(m)(1)(A) (explaining what counts as a payment under the PSLF program); 34 C.F.R.
§ 682.215(f) (explaining what counts as a payment under the IDR plans).  The only exceptions
are if a borrower in forbearance: (1) makes additional payments equal to or greater than the
amount they would have paid under a repayment plan, or (2) is a low-income borrower who
qualifies for a $0 payment on a repayment plan.  34 C.F.R. § 685.219(g)(6).  These exceptions
were the only ways for borrowers to obtain credit toward total loan forgiveness while not making
the required monthly payments.  *Id.*  As with so many other things, the COVID-19 pandemic
changed that.

The pandemic triggered a dramatic decline in employment and economic activity.  Our
nation's gross domestic product dropped by "the largest percentage in one quarter in the history
of the data series."[4]  Employment fell by 22 million jobs, and, between February 2020 and April

---

[4]Marc Labonte & Lida R. Weinstock, Cong. Rsch. Serv., R47115, U.S. Economic Recovery in the Wake of
COVID-19: Successes and Challenges 1, 9 (2022).

2020, the unemployment rate rose from 3.5% to 14.7%.[5]  In short, many Americans faced deep economic uncertainty.  As a result, many of those with student-loan debt faced the very real prospect of defaulting on their loans.

The executive and legislative branches reacted quickly.  On March 20, 2020, the Department of Education announced that borrowers could suspend their federal student-loan payments for at least 60 days.[6]  It also set the interest rates on all federal student loans to zero for 60 days.[7]  A week later, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.  The CARES Act, among many other things, directed the Department of Education to extend the repayment-and-interest suspension on all student-loan payments through September 30, 2020.  CARES Act, Pub. L. 116-136, §§ 3513(a)–(b), 134 Stat 281, 404 (2020).  And Congress instructed the Department of Education to count each month during the suspension toward loan forgiveness for all borrowers enrolled in the IDR plans and the PSLF program.  *Id.* § 3513(c).

Over the next two years, the Department of Education extended the repayment-and-interest pause six more times.[8]  *See Biden v. Nebraska*, 600 U.S. 477, 487 (2023) ("Over a year and a half passed with no further action beyond keeping the repayment and interest suspensions in place.").  And on August 24, 2022, the Department of Education announced one "final" extension until December 31, 2022.[9]

That same day, the Secretary of Education made a historic announcement.  Under the Higher Education Relief Opportunity for Students ("HEROES") Act of 2003, the Department of Education would forgive up to $20,000 in federal student loans for borrowers who met certain

---

[5]*Id.*

[6]*See* Alexandra Hegji, Cong. Rsch. Serv., IF12136, Student Loans: A Timeline of Actions Taken in Light of the COVID-19 Pandemic 1 (2024).

[7]*Id.*

[8]*See id.* at 1–2.

[9]*See FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/.

income thresholds.[10]  But legal challenges swiftly followed.  And in response, the Department of Education announced that it was extending the repayment-and-interest pause through the earlier of 60 days after the litigation regarding the debt-relief plan was resolved or June 30, 2023.[11]

That litigation shaped this case.  Six states challenged the Department of Education's cancellation of student-loan debt, arguing that the agency exceeded its statutory authority. *Nebraska*, 600 U.S. at 488.  The Supreme Court concluded that the HEROES Act did not provide a statutory basis for the mass debt cancellation program.  *Id.* at 502.  And absent "clear congressional authorization," the Department of Education could not discharge student loans in this manner.  *Id.* at 506 (quotation omitted).

In response to the Supreme Court's decision, the President announced that "the Department [was] instituting a 12-month 'on-ramp' to repayment, running from October 1, 2023 to September 30, 2024."[12]  The goal of this program was to allow "financially vulnerable borrowers who miss monthly payments during this period" to avoid delinquency or default.[13]  The Department of Education wanted to provide "borrowers who cannot make payments right away the necessary time to adjust, enabling them to ultimately make their monthly payments and meet their financial obligations on their loans."[14]  So while interest would accrue during the on-ramp period, it would not capitalize at the end of the twelve-month period.[15]

### B.

Mackinac Center for Public Policy is a nonprofit, tax-exempt organization that qualifies as a public service employer under the PSLF program.  It "has previously employed and

---

[10]*See* Edward C. Liu & Sean M. Stiff, Cong. Rsch. Serv., R47505, Student Loan Cancellation Under the HEROES Act 1 (2023).

[11]*See* Hegji, *supra* note 6, at 2.

[12]*FACT SHEET: President Biden Announces New Action to Provide Debt Relief and Support for Student Loan Borrowers*, The White House (June 30, 2023), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2023/06/30/fact-sheet-president-biden-announces-new-actions-to-provide-debt-relief-and-support-for-student-loan-borrowers/.

[13]*Id.*

[14]*Id.*

[15]*Id.*

currently employs borrowers who participate, may become eligible to participate, or have previously participated in the PSLF program." R. 22, PageID 183. And it "expects to recruit other such employees in the future." *Id.*

In April 2023, Mackinac sued the Department of Education, the Secretary of Education, and the Department of Education's Chief Operating Officer of Federal Student Aid (collectively, the "Department of Education"). The nonprofit's complaint alleges that the repayment-and-interest suspensions and the on-ramp to repayment "reduc[ed] PSLF incentives" that benefit public service employers "in the competition to hire and retain college-educated workers." *Id.* at 182. The complaint further alleges that the Department of Education "inflicted economic harm" by "eroding the statutory incentives" designed to benefit public service employers. *Id.* at 189. Mackinac asserts that the Department of Education's actions violate Articles I and IV of the U.S. Constitution and the Administrative Procedure Act.

The Department of Education moved to dismiss Mackinac's complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. The district court concluded that Mackinac lacked Article III standing and dismissed the case. This appeal followed.

**II.**

We review de novo the district court's dismissal of Mackinac's complaint for lack of subject-matter jurisdiction. *Phillips v. DeWine*, 841 F.3d 405, 413 (6th Cir. 2016). Defendants can challenge the district court's subject-matter jurisdiction under Rule 12(b)(1) through either a facial attack or a factual attack. *McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012). When a party brings a facial attack, it "argues that a complaint does not adequately plead standing even accepting its facts as true." *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543 (6th Cir. 2021). With a factual attack, on the other hand, "no presumptive truthfulness applies to the [complaint's] allegations and the district court has wide discretion to review evidence outside the complaint." *Howard v. City of Detroit*, 40 F.4th 417, 422 (6th Cir. 2022) (citation modified).

The Department of Education brought a facial challenge.

### III.

The U.S. Constitution limits the "judicial Power" of federal courts to resolving "Cases" and "Controversies."   U.S. Const. art. III, § 2.   "No principle is more fundamental to the judiciary's proper role in our system of government" than the case-or-controversy requirement. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation modified).

A plaintiff must establish that it has standing to sue before a court can consider the merits of its claims.  *United States v. Texas*, 599 U.S. 670, 675 (2023).  It is the "threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

"The fundamentals of standing are well-known and firmly rooted in American constitutional law."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).  A party invoking federal-court jurisdiction must show (1) an injury in fact, (2) causation, and (3) redressability.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).  Causation requires that "the plaintiff's injury . . . be fairly traceable to the challenged action of the defendant."  *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (citation modified).  And redressability means that the court can remedy the injury. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025).

Mackinac bears the burden of establishing standing.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  It must prove standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation."  *Id.* (quotation omitted).  Because the district court dismissed this case at the pleading stage, Mackinac needed to "clearly allege facts demonstrating" a "plausible claim" that it has standing.  *Spokeo*, 578 U.S. at 338 (citation modified); *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 544 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

The dispositive question is whether the complaint clearly alleges facts showing that Mackinac suffered an injury in fact because of the Department of Education's repayment-and-interest suspensions and on-ramp to repayment for student borrowers. An injury in fact "must affect the plaintiff in a personal and individual way and not be a generalized grievance." *All. for Hippocratic Med.*, 602 U.S. at 381 (citation modified). An actual or imminent injury is not speculative—in other words, "the injury must have already occurred or be likely to occur soon." *Id.* An injury in fact includes "a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights." *Id.*

A plaintiff "faces an uphill battle in establishing standing if it is not itself the object of the government action or inaction at issue." *Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 351 (6th Cir. 2024) (citation modified). In these situations, "much more is needed to establish standing," *Texas*, 599 U.S. at 678 (citation modified), because "whether an element of standing exists depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," *Cardona*, 102 F.4th at 351 (citation modified).

Mackinac contends that it can show an injury in fact under theories of direct economic injury and competitor standing. We address each argument in turn.

**A.**

Mackinac argues that it suffered a direct economic injury because the Department of Education "economically harmed PSLF employers by lowering their statutorily prescribed wage subsidy." D. 24 at p.29. It claims that Congress crafted the PSLF program as a "governmentally granted [wage] subsidy" designed to benefit "PSLF employers like Mackinac." *Id.* at 22, 29.

"If a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). In other words, when government regulation hurts a company's "bottom line," "those monetary costs are of course an injury." *Diamond Alt. Energy*, 606 U.S. at 114 (citation modified).

The PSLF program provides an economic benefit to borrowers in the form of loan forgiveness. *See* 20 U.S.C. § 1087e(m)(1). And it promotes the interest of public service employers' recruitment and retainment efforts by reducing their employees' student-loan debts. *See* 34 C.F.R. § 685.219(a) (describing the goal of the PSLF program as "encourag[ing] individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements").

The complaint alleges that the administrative suspensions and on-ramp harmed public service employers, like Mackinac, because borrowers "have relatively less incentive, both financially and in terms of speed, to seek forgiveness under [the] PSLF by working" in public service. R. 22, PageID 189. It also alleges that the Department of Education "erod[ed] the statutory incentives and advantages Congress legislated to help [Mackinac] and other public service employers recruit and retain college-educated talent." *Id*.

But the complaint falls short of pleading an economic injury because it offers legal conclusions disguised as facts. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (noting that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions" (citation modified)). The complaint does not include "specific, concrete facts" showing an actual economic injury. *Warth*, 422 U.S. at 508. Mackinac merely speculates that the repayment-and-interest suspensions and on-ramp to repayment somehow reduced the financial incentive for borrowers to remain in public service. For instance, Mackinac does not allege that any of its employees stopped making payments during the administrative suspensions or made partial or late payments during the on-ramp to repayment. Nor does Mackinac assert that the Department of Education's actions affected its ability to recruit employees or fill vacancies. In other words, Mackinac has failed to point to any money it lost because of the Department of Education's actions. Mackinac has thus failed to establish the "much more" that is needed to show a direct injury resulting from the Department of Education's actions regulating student-loan borrowers, not public service employers. *See Texas*, 599 U.S. at 678 (quotation omitted).

*Clinton v. City of New York* does not lead to a different conclusion.  524 U.S. 417 (1998).  There, the Supreme Court held that a farmers' cooperative had standing to challenge the President's veto of § 968 of the Taxpayer Relief Act of 1997.  *Id.* at 421.  Section 968 would have allowed the owners of food refiners and processors to defer recognition of capital gains if they sold their properties to eligible farmers' cooperatives.  *Id.* at 423–24.  One of the plaintiffs that challenged the President's decision was a farmers' cooperative negotiating the sale of a processing facility with a food processor that would have qualified for the tax benefit.  *Id.* at 426–27.  The negotiations terminated after the President vetoed § 968.  *Id.*

The cooperative, according to the Court, had standing to sue because it "suffered an immediate injury when the President canceled the limited tax benefit that Congress had enacted to facilitate the acquisition of processing plants."  *Id.* at 432.  It reached this conclusion, in part, because Congress enacted the statute to provide a benefit to a defined category of potential purchasers of a defined category of assets.  *Id.*  As the Court noted, "the members of that statutorily defined class received the equivalent of a statutory 'bargaining chip' to use in carrying out the congressional plan to facilitate their purchase of such assets."  *Id.* (citation modified).  And the cooperative alleged specific facts to establish its injury: farmers organized the cooperative to acquire processing facilities, the cooperative planned to use the benefits of § 968, and the cooperative had been negotiating with an owner of a processing plant pursuing a tax-deferred sale when the President vetoed the provision.  *Id.*  The cooperative also actively sought other processing facilities it could purchase if it could obtain reversal of the cancellation.  *Id.*

This case differs from *Clinton.*  The suspensions and on-ramp did not alter—must less cancel—Congress's requirements for borrowers to obtain total loan forgiveness under the PSLF program.  Mirroring the Court's language in *Clinton*, Mackinac claims that the PSLF program represents an economic "bargaining chip" that it "uses to attract and retain college-educated employees in the labor market."  But unlike the farmers' cooperative in *Clinton*, Mackinac fails to allege "critical facts" showing that it "suffered an immediate injury" due to the suspensions and on-ramp.  *See* 524 U.S. at 432.  For example, it provides no evidence that, because of the Department of Education's actions, it has been unable to recruit or retain college-educated talent.

Mackinac merely speculates that the suspensions and on-ramp diminished the financial incentives for borrowers to remain in public service jobs.

The Supreme Court's recent decision in *Bost v. Illinois State Board of Elections* does not help Mackinac either. 146 S. Ct. 513 (2026). In that case, the Supreme Court determined that candidates for political office had standing to challenge rules governing the counting of votes in their elections. *Id.* at 522. As the Court reasoned, political candidates "seek to represent the people" and "their interest in that prize cannot be severed from their interest in the electoral process." *Id.* at 519. "Departures from the preordained rules cause them particularized and concrete harm" because "an unlawful extension of vote counting deprives candidates of the opportunity to compete for election under the Constitution and laws of the United States." *Id.* at 520–21.

*Bost* focused on the "particularly concrete" harm to political candidates "whose very jobs depend on the support of the people." *Id.* at 520. By contrast, Mackinac's standing claim falls well short of the "obvious personal stake" political candidates have in the legitimacy of their elections. *See id.* Mackinac claims that "simple economic logic" supports it standing theory, R. 22, PageID 188, but the complaint pleads no specific facts showing that these pandemic-related actions caused any concrete harm. Article III standing requires Mackinac to do so. *See Spokeo*, 578 U.S. at 338; *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 544 (2020) (concluding that the plaintiffs failed to establish standing because they "failed to plausibly and clearly allege a concrete injury").

No doubt public service employers have a considerable interest in their employees' participation in the PSLF program. But the repayment-and-interest suspensions and on-ramp to repayment did not affect the PSLF program's conditions or borrowers' eligibility to participate in any way. Public service employers, like Mackinac, continue to receive the benefits of their status as PSLF-qualified employers. And public service employees continue to receive the benefits of being enrolled in the PSLF program. Mackinac has not shown that the suspensions or on-ramp affected any concrete economic interest. And without such factual allegations,

Mackinac has failed to move its economic-injury claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.[16]

**B.**

We next turn to Mackinac's competitor-standing argument. "When the government regulates (or under-regulates) a business, the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain, such as certain manufacturers, retailers, suppliers, competitors, or customers." *Diamond Alt. Energy*, 606 U.S. at 116 (quotation omitted). Under the competitor-standing doctrine, economic actors suffer an injury in fact "when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Cardona*, 102 F.4th at 351 (quotation omitted). Standing under this theory requires that "the challenged government action nonspeculatively threatened economic injury to the challenger by the ordinary operation of economic forces." *Incyte Corp. v. Sun Pharm. Indus., Inc.*, 136 F.4th 1096, 1104 (Fed. Cir. 2025) (quotation omitted).

Although competitor standing "supplies the link between increased competition and tangible injury," it "does not, by itself, supply the link between the challenged conduct and increased competition." *Cardona*, 102 F.4th at 352 (quotation omitted). "The latter must be apparent from the nature of the challenged action itself or from the well-pleaded allegations of the plaintiff's complaint." *Id.* (citation modified).

Mackinac argues that the Department of Education's administrative suspensions and on-ramp to repayment increased competition between public service employers and private sector employers. So the nonprofit must demonstrate that these actions caused "an actual or imminent increase in competition, which increase will almost certainly cause an injury in fact to any competitor in the relevant market." *Id.* (citation modified). We presume increased competition if one of the following circumstances exists: "(1) the government's actions allowed

---

[16]Mackinac also relies on *Biden v. Nebraska*, 600 U.S. 477 (2023). But its reliance on that case is misplaced. *Nebraska* focused on the Department of Education's cancellation of student debt under the HEROES Act. *Id.* at 488. The Court stated specifically that its decision does not "control any challenge to the Secretary's temporary suspensions of loan repayments and interest accrual" "with respect to both standing and the merits." *Id.* at 499 n.5.

new persons or entities to enter a fixed regulated market; (2) the government created price competition by lifting price controls on competitors; or (3) the government reimburses a competitor for selling its product or service at discounted rates." *Id.* (citation modified). If the presumption does not apply, then the "complaint must establish that the government's action increased competition in the relevant market." *Id.*

Mackinac purports to rely on the second circumstance—that the government encouraged price competition by lifting price controls on competitors. It asserts that the Department of Education's actions "compromised" its competitiveness in the labor market by altering market conditions. It follows, according to Mackinac, "that *reducing* the [wage] subsidy is an injury because it makes [public service employers like Mackinac] *less* competitive." D. 24 at p.46. But it is less obvious that the suspensions and on-ramp increased competition between private and public service employers because these actions do not benefit either group directly; they benefit student-loan borrowers. So the presumption does not apply.

We thus look to Mackinac's complaint to determine whether its factual allegations support competitor standing. Mackinac does not allege any specific facts showing that the suspensions and on-ramp caused competitive harm. Its argument suffers from similar flaws as its competitor-standing argument in *Cardona*. There, Mackinac sued the Department of Education after it announced a one-time account adjustment that would count months borrowers spent in excessive forbearance status toward debt forgiveness. *Cardona*, 102 F.4th at 349. Mackinac argued that the adjustment reduced its competitive benefits, including the "the financial incentive for student-loan debtors to seek and remain in jobs with public service employers, at any given wage." *Id.* at 352. We held that Mackinac did not allege a competitive injury because the complaint only cursorily asserted that the financial adjustment discouraged borrowers from pursuing public service careers. *Id.*

Likewise here, Mackinac has not clearly alleged facts showing that the suspensions or on-ramp directly increased competition. Again, Mackinac conclusorily asserts that the suspensions and on-ramp "made private sector work comparatively more attractive than working for a qualified public service employer." R. 22, PageID 186. But such broad, cursory assertions do

not explain how the suspensions and on-ramp reduced the financial incentives for borrowers to remain in public service.

And Mackinac does not identify its competitors beyond broadly describing them as private employers that hire college-educated workers. Although Mackinac asserts that it need not identify its competitors to establish competitor standing, its argument fails to appreciate that the "basic requirement" of competitor standing "is that the complainant must show an actual or imminent increase in competition" in the market in which it is a "direct and current competitor." *Wash. All. of Tech. Workers v. DHS*, 50 F.4th 164, 176 (D.C. Cir. 2022) (citation modified). For "only then does the plaintiff satisfy the rule that he was personally disadvantaged." *Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir. 1998) (citation modified).

Mackinac alleges that it "competes in the labor market to recruit and retain college-educated employees for staff positions." R. 22, PageID 183. Such a bare allegation does not establish the market in which Mackinac, or its competitors, operates. *See Cardona*, 102 F.4th at 353. Mackinac has not shown that it competes in the same field as *all* private-sector employers who have purportedly received an unlawful benefit. And it is unclear how these unidentified private-sector employers received any retention or recruitment benefits from the suspensions and on-ramp. Mackinac has thus failed to sufficiently plead that it has suffered a competitive injury.

We reject Mackinac's counterarguments. It largely argues that Defendants' actions reduced its wage subsidy and thus made public service employers "less competitive" compared to "employers that don't qualify under the PSLF program." D. 24 at p.46. But its economic theory rests on a "speculative chain of possibilities." *Clapper*, 568 U.S. at 414. The nonprofit suggests that the pause in loan payments and interest accrual caused (or will cause) borrowers to change their employment plans and seek jobs in the private sector. From there, Mackinac is less competitive in the labor market for college-educated talent. This theory about the suspensions and on-ramp incentivizing borrowers to seek employment in the private sector does not "demonstrate a sufficient likelihood" of compromising Mackinac's competitiveness in the labor market. *TransUnion*, 594 U.S. at 438.

Mackinac also contends that it need not show proof of competitive losses to establish competitor standing.  But as we have held, the competitor standing doctrine "does not, by itself, supply the link between the challenged conduct and increased competition."  *Cardona*, 102 F.4th at 352 (quotation omitted).  So competitor standing must be "based on an injury more particularized and more concrete than the mere assertion that something unlawful benefited the plaintiff's competitor."  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013).  "Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the courts."  *Clapper*, 568 U.S. at 414 n.5 (citation modified).

Mackinac's complaint suffers from a fundamental flaw.  It fails to show the necessary link between the suspensions and on-ramp on one hand and increased competition on the other. *See Cardona*, 102 F.4th at 351.  None of the complaint's allegations demonstrates this connection.  It is speculative whether Mackinac's purported risk of competitive losses is imminent or traceable to Defendants' actions.

In sum, although "most competitor standing cases depend on core economic postulates," *id.* at 356 (citation modified), Mackinac's allegations regarding supply and demand and the impact of financial incentives on student loan borrowers—nonparties to this action—are speculative.  Thus, Mackinac has failed to plead an injury in fact under a competitive-standing theory.

**IV.**

For these reasons, we **AFFIRM** the district court's judgment.